**SIGNED THIS: July 16, 2007**

_____
**MARY P. GORMAN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | In Bankruptcy |
| CHAD MICHAEL MARTIN and | ) | |
| JILL KATHLEEN MARTIN, | ) | Case No. 06-71461 |
| | ) | |
| Debtors. | ) | |

# O P I N I O N

This matter comes before the Court upon the United States Trustee's ("UST") Motion to Dismiss Pursuant to 11 U.S.C. §707(b)(1) and (b)(2) ("Motion to Dismiss"). The Court has considered the evidence and the arguments of counsel and finds that the Debtors have established sufficient "special circumstances" to overcome the presumption of abuse upon which the UST relies in seeking dismissal. The UST's Motion to Dismiss will be denied.

Chad Martin and Jill Martin ("Debtors") filed their voluntary

petition under Chapter 7 of the Bankruptcy Code on October 20, 2006.   At the time of filing, the Debtors were the parents of two young children.  Their third child was born in December, 2006.  The Debtors reside in Clinton, Illinois.  Mr. Martin is employed as a machine operator at a tire plant in Bloomington, Illinois.  Mrs. Martin is a nurse and works full time at a hospital in Lincoln, Illinois, and part time at a hospital in Clinton, Illinois.  Mrs. Martin also operates a small Internet sales business.

With their Chapter 7 petition, the Debtors filed the required Official Form 22A- Chapter 7 Statement of Current Monthly Income and Means-Test Calculation ("CMI").   The CMI was developed to implement the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Specifically, the CMI is used to make the calculations required under §707(b) to determine whether a presumption of abuse arose upon the filing of the Debtors' Chapter 7 petition and, accordingly, whether the case should be dismissed.  11 U.S.C. §707(b).

In completing their CMI, the Debtors first calculated their "current monthly income" for the six-month period prior to filing and then annualized that figure in accordance with the statutory formulae.  Their current monthly income was determined to be $7,811.51, resulting in an annualized income on the CMI of $93,738.12.  As provided by §707(b)(7), the Debtors then compared their annualized income to the applicable median income for a four-

-2-

person household in Illinois which, at the time, was $72,368. Because the Debtors' annualized income exceeded the applicable median income, the Debtors were required to complete additional portions of the CMI to calculate their allowable deductions and to determine whether a presumption of abuse arose. 11 U.S.C. §707(b)(2).

The Debtors calculated their deductions on the CMI and claimed total deductions in the amount of $7,703.15. When the Debtors' deductions were subtracted from their current monthly income, their monthly disposable income as defined by §707(b)(2) was $108.36 and their 60-month disposable income was $6,501.60. Because their 60-month disposable income was greater than $6,000 but less than $10,000, the Debtors were required to calculate whether the payment of their 60-month disposable income to unsecured creditors would result in at least a 25% dividend to those creditors. 11 U.S.C. §707(b)(2).

On their CMI, the Debtors stated that they had scheduled $43,405 of non-priority, unsecured debt. Accordingly, they calculated that $10,851.25 would be required to pay a 25% dividend to the Debtors' unsecured creditors.[1] Because the Debtors' 60-

---

[1] The Debtors actually listed $37,405 of non-priority, unsecured debt on their Schedule F. However, they also listed a $10,680 student loan debt on Schedule E which should have been listed on Schedule F because student loans, even those owed to a governmental agency, are not entitled to priority. 11 U.S.C. §507. Further, the Debtors scheduled $6,000 as the under-secured portion of the secured debts listed on Schedule D. Accordingly, Debtors' total

month disposable income available to pay unsecured creditors - $6,501 - was not sufficient to pay a 25% dividend, the Debtors reached the conclusion on line 55 of their CMI that no presumption of abuse arose with the filing of their petition.

The UST disagreed with the Debtors' calculations and, on January 17, 2007, filed the Motion to Dismiss. The UST did not dispute the Debtors' calculation of monthly or annualized income, but raised numerous objections to the Debtors' expense deductions. The UST objected to the Debtors' deductions for telecommunication services and for excess home energy costs. The UST also claimed that the Debtors had incorrectly calculated their deductions for taxes and for the secured debt payments on their two vehicles. The UST asserted that a presumption of abuse arose with the filing of the Debtors' petition. As part of the Motion to Dismiss, the UST attached a proposed revised CMI which suggested that the Debtors actually had monthly disposable income of $1,216.84 and 60-month disposable income of $73,010.40.

The Debtors filed a detailed Response to the Motion to Dismiss. The Debtors conceded several issues raised by the UST, including the fact that a presumption of abuse arose with their filing. Debtors, however, raised in their Response a number of "special circumstances" to overcome that presumption of abuse.

_____

non-priority, unsecured debt is $54,085 and $13,521.25 would be required to pay a 25% dividend.

-4-

Specifically, the Debtors asserted that their actual income was lower than the amount reflected on the original CMI and that they had additional expenses due to the birth of their third child. The Debtors also suggested that their student loan payment, their excess transportation costs, and a post-petition 401K loan all created additional "special circumstances." The Debtors also prepared a revised CMI based on their "special circumstances" which showed negative monthly disposable income.

The parties exchanged documents and information and were able to stipulate to most of the facts at issue. Accordingly, stipulated exhibits were presented along with oral arguments on April 5, 2007.

BAPCPA revised §707(b) to require a detailed analysis in every consumer case of whether the granting of relief in the case would be an abuse of the Bankruptcy Code. As stated above, the CMI was developed to assist in calculating a debtor's potential ability to pay creditors and to determine whether a presumption of abuse arises with respect to each case filing. Under only limited, "special circumstances" may the presumption of abuse be rebutted. Section 707(b)(2)(B) describes how the presumption may be rebutted and provides as follows:

> (B)(i)  In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or

adjustments of current monthly income for which there is no reasonable alternative.

(ii)  In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide -

(I)  documentation for such expense or adjustment to income; and

(II)  a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.

(iii)  The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.

(iv)  The presumption of abuse may only be rebutted if the additional expenses or adjustments to income referred to in clause (i) cause the product of the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of subparagraph (A) when multiplied by 60 to be less than the lesser of -

(I)  25 percent of the debtor's nonpriority, unsecured claims, or $6,000, whichever is greater; or

(II)  $10,000.

11 U.S.C. §707(b)(2)(B).

The Debtors' defense to the Motion to Dismiss rests on their assertion of sufficient "special circumstances" to overcome the presumption of abuse.  The term "special circumstances" is not defined in the Bankruptcy Code.  The rules of statutory construction, therefore, require that, in the absence of a particular definition, the words of the statute be given their

plain meaning.  Further, where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'."  <u>U.S. v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), *quoting* <u>Caminetti v. U.S.</u>, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

The word "special" is used in common parlance and, when used as an adjective, means "surpassing what is common or usual; exceptional; ... distinct among others of a kind; peculiar to a specific person or thing; particular; ... additional; extra." *The American Heritage College Dictionary* 1306 (3rd ed. 1993).  The word "circumstance" is also one of general usage and  means "a determining or modifying factor; ...  [a] condition or fact that determines or must be considered in the determining of a course of action." <u>Id.</u> *at* 255.  Thus, "special circumstances" in the context at issue here means uncommon, unusual, exceptional, distinct, peculiar, particular, additional or extra factors, conditions, or facts which must be considered in determining whether the Debtors' filing actually constitutes abuse.  Accordingly, this Court concludes that determining the existence of "special circumstances" requires an analysis of a wide variety of facts and issues related to the particular debtors involved.

The rapidly developing case law on "special circumstances" is also helpful in understanding the concept.  Relying on legislative history, one court has held that "the term 'special circumstances'

requires a fact-specific, case-by-case inquiry into whether a debtor has a 'meaningful ability' to pay his or her debts in light of an additional expense or adjustment to income not otherwise reflected in the means test calculation." In re Delbecq, ___ B.R. ___, 2007 WL 1408711 *4 (Bankr. S.D. Ind.). Other courts also have held that a determination of "special circumstances" under §707(b)(2)(B) requires a fact-specific inquiry and have rejected rigid rules which would limit that inquiry. *See*, e.g., In re Armstrong, 2007 WL 1544591 *3 (Bankr. N.D. Ohio) ("special circumstances" need not be unanticipated); In re Templeton, ___ B.R. ___, 2007 WL 886010 *2-3 (Bankr. W.D. Okla.) ("special circumstances" are not limited to those beyond a debtor's control and the statutory examples are not exhaustive); In re Haman, ___ B.R. ___ , 2007 WL 1175532 *5-6 (Bankr. D. Del.) ("special circumstances" may include obligations which were undertaken voluntarily and are not limited to the examples of serious medical conditions or active military service set forth in the statute); In re Lenton, 358 B.R. 651, 661-62 (Bankr. E.D. Pa. 2006) (401K loan payment may constitute a "special circumstance" and fact specific inquiry required).

The statute places the burden on the Debtors to present their "special circumstances" in a detailed manner. As set forth above, the Debtors have claimed several "special circumstances" and each will be reviewed to determine compliance with the statute and

developing case law.

## A. Change in Income

Debtors claim that their six-month historical income used on the CMI to determine the presumption of abuse overstated their actual income available to pay creditors. Debtors assert that, during the six-month period used for the CMI calculation, Mr. Martin had an unusually high number of overtime hours which are no longer available to him, and Mrs. Martin worked more hours at her part time job than she normally would. The Debtors asserted that they have had a sustained reduction in earnings and, accordingly, that an adjustment to their earnings calculation should be made to determine whether abuse actually exists.

Because the Debtors filed their case in October, 2006, they were required to use their actual earnings for the period of April through September, 2006, to calculate their current monthly income on their original CMI. 11 U.S.C. §101(10A). That calculation suggested that the Debtors had current monthly income of $7,811.51. The UST's Motion to Dismiss was filed in January, 2007. The Debtors' presented a new calculation showing that, for the six-month period directly preceding the filing of the Motion to Dismiss - July through December, 2006 - their actual average monthly income from employment was only $6,745.61. The Debtors argue that the drop in their income is a "special circumstance" warranting an

adjustment in the determination of abuse calculation.

The UST has been supplied with all of the Debtors' documents and does not dispute the Debtors' mathematical calculation of their income for the time period of July through December, 2006. The UST argues, however, that the Debtors are attempting to recast the formula for determining the presumption of abuse by using a different six-month period than the period mandated by statute.[2] At the hearing, the Debtors' counsel made clear that it was not his intent to assert that a period of time other than the period described in the statute could be used to determine the initial presumption of abuse. Rather, he argued that a different period of time could be used to determine whether abuse actually exists. The statute specifically allows adjustments to income as a "special circumstances" and, therefore, changes in income from that reflected in the original CMI must be considered. This Court agrees that the statute allows consideration of changes in income when considering if actual abuse exists, and believes that actual income must be considered in determining whether debtors have a meaningful ability to pay their creditors.

---

[2]

Some confusion may have been caused by the manner in which the Debtors' amended CMI using the alternate computation period was filed. Although it was filed at the same time as the Debtors' Response to the Motion to Dismiss, it was filed and docketed separately. Thus, rather than being clearly labeled as an exhibit in support of the Response, it appeared to be an amended CMI replacing the original CMI and substituting a computation period not allowed by statute.

This Court believes that the Debtors' use of the six-month period directly preceding the filing of the Motion to Dismiss was an appropriate way to establish a sustained decrease in income. The tendering of pay stubs from just one or several pay periods may well have failed to convince the Court that any real change in income had occurred.  Taking a longer view is appropriate, and using the same time period as the statute mandates to calculate the original presumption cannot be said to be unreasonable.  The Debtors here have established that, over a sustained period of time, their actual income has been less than the amounts calculated on their original CMI.  This Court, therefore, finds that the Debtors' actual current monthly income from employment available to support their family and pay creditors, which should be used to determine whether abuse actually exists, is $6,745.61.

Mrs. Martin also has a small Internet sales business.  On their original CMI, the Debtors disclosed that Mrs. Martin netted $199.97 per month from that business.  The UST raised no objections to that amount in the Motion to Dismiss.  In the documents filed with their Response, however, the Debtors suggested that Mrs. Martin's ongoing income for the business would only be $114.01 per month.

At the hearing, Debtors' counsel presented a listing of all amounts received by Mrs. Martin for her sales during calendar year 2006 along with a separate listing of her expenses.  Debtors'

counsel conceded that he had erred in calculating the sales income for the Response and that Mrs. Martin's actual net monthly income from the sales business was approximately $206. Using the documents presented, this Court was able to calculate that, for the period of July through December, 2006, Mrs. Martin did, in fact, average $206 in net monthly sales income.

A document prepared by the UST's office was presented by agreement at the hearing to show a side-by-side comparison of the parties' respective positions. On that document, the UST used the figure of $376.24 for Mrs. Martin's monthly net sales income. The UST did not, however, present any documents showing how that number was calculated. When Debtors' counsel conceded his error and suggested that the correct number for the monthly sales income was $206, the Assistant UST responded, "that sounds appropriate."

Because the Debtors raised this issue as a "special circumstance" but then conceded that their calculations were incorrect, this Court cannot find that they have met their burden. To the contrary, they established that Mrs. Martin's income from her sales business is actually a few dollars higher each month than originally disclosed on their CMI. The UST did not raise the issue in the Motion to Dismiss or any other pleadings and presented no proof at the hearing that Mrs. Martin's sales income is significantly higher than what was originally disclosed. Accordingly, for purposes of determining the existence of actual

abuse, this Court will use the $206 monthly figure established now by the Debtors to be the correct calculation.

Adding the $206 of monthly net sales income to the $6,745.61 of employment income previously addressed results in total current monthly income of $6,951.61. This is the amount of income which will be compared to the Debtors' allowable expenses to determine whether abuse exists.

### B. Birth of a Child

When the Debtors filed their case in October, 2006, they were the parents of two children and Mrs. Martin was approximately seven months pregnant. The Debtors' third child was born in December, 2006. The Debtors claim that the addition of their new baby to the household has increased their expenses and constitutes a "special circumstance" which would justify an increased standard deduction for their food, clothing, and miscellaneous expenses. On their original CMI, the Debtors claimed the standard deduction for a household of four persons, which was $1,546. They suggest that the standard deduction for a household of five persons in the amount of $1,762 should be used in calculating whether abuse actually exists. This would result in an additional deduction of $216 on their CMI.

The UST objects to the allowance of this "special circumstance" and the Assistant UST appearing at the hearing simply argued that it is the position of the UST that no post-petition

developments, even the birth of a child, should be considered.  The
Assistant UST cited no authority for the position and provided no
rationale for the position.

This Court finds that Mrs. Martin's pregnancy at the time of
filing and the subsequent birth of the Debtors' third child are
exceptional, additional, and extra facts which must be considered
in determining the existence of abuse.  The statute allows a
"special circumstance" expense deduction if Debtors establish that
there is no reasonable alternative to incurring the claimed
expense.  Here, the Debtors have clearly established that there is
no reasonable alternative to the feeding, clothing, diapering, and
caring for their new baby, and the UST has not even attempted to
suggest any reasonable alternative.  The Debtors' assertion that
the amount of expense adjustment to which they are entitled should
be the difference in the standards between a four-person and five-
person household is also reasonable.  The UST has not offered a
more appropriate method of calculating the adjustment.
Accordingly, the Court finds that the Debtors are entitled to a
$216 expense adjustment due to the "special circumstance" of the
birth of their third child.

### C. Student Loan Payment

The Debtors scheduled a student loan obligation to the U.S.
Department of Education in the amount of $10,680.  They have

budgeted a monthly student loan payment of $178.  The Debtors have
not sought to discharge the student loan and their attorney
conceded at the hearing that, based on the current state of the
law, the Debtors would not qualify for a discharge of their student
loan debt.  11 U.S.C. §523(a)(8); <u>Matter of Roberson</u>, 999 F.2d
1132 (7th Cir. 1993); <u>In re Simmons</u>, 334 B.R. 632 (Bankr. C.D. Ill.
2005), *aff'd* 2006 WL 2556581 (C.D. Ill.).

The Debtors argued, however, that their obligation to pay the
student loan debt constitutes a "special circumstance" and that
their $178 per month payment should be considered in determining
their ability to pay other creditors and whether abuse exists.  The
Assistant UST again argued that it is the position of the UST that
student loan debt payments are not to be considered "special
circumstances" but again offered no authority or rationale for the
position.

At least three other courts have already considered the issue
of whether a student loan obligation constitutes a "special
circumstance" and, in each case, found that such an obligation met
the statutory requirements for "special circumstance."  In
<u>Templeton</u>, ___ B.R. ___, 2007 WL 886010, the court found that,
because it was undisputed that the student loans in question were
non-dischargeable, the debtors had no reasonable alternative other
than to pay them.  The court held "there is nothing within the
Debtors' power to reduce or otherwise avoid the additional expense

-15-

of the student loans." Id. at *2.

In Haman, ___ B.R. ___, 2007 WL 1175532, the court also found that, because the student loan obligation of the debtor who had co-signed for her son was non-dischargeable, the debtor had no reasonable alternative to payment of the loan. The debtor had no ability to pay the loan in full and avoid ongoing payments and her son could not make the payments due to a medical condition. Further, the court rejected the arguments of the UST in that case that partial payment through a Chapter 13 case would be a reasonable alternative. Id. at *7.

Most recently, in Delbecq, ___ B.R. ___ , 2007 WL 1408711, the court found "special circumstances" because the existence of student loan debt limited the debtor's meaningful ability to pay her other debts. The court found that, because the student loan debt was non-dischargeable, forcing the debtor to use her limited funds to pay other unsecured debt instead of the student loan debt would simply result in the student loan debt increasing over time due to interest accumulation. The court also rejected the alternative of a Chapter 13 filing. The court found no reason to incur the administrative costs of a Chapter 13 where virtually no distribution would be made to other unsecured creditors. Id. at *5.

This Court finds the reasoning of Templeton, Haman, and Delbecq persuasive. Here, the Debtors have acknowledged the non-

-16-

dischargeability of their student loan debt and they have no reasonable alternative other than to pay the debt. Chapter 13 is not a reasonable alternative. A Chapter 13 filing would result in only partial payment of the student loan during the term of the Chapter 13 case and, most likely, a substantial balance would still be due upon completion of the case. Student loan debt is non-dischargeable and, as such, must be paid. The existence of this debt is a distinct, particular, additional, and extra factor which this Court should consider in determining whether abuse exists here. This Court finds that the Debtors' obligation to pay their student loan debt is a "special circumstance" and that the Debtors are entitled to an expense adjustment of $178 for their monthly student loan payment.

### D. Excess Travel Costs

Mr. Martin works in Bloomington, Illinois, and Mrs. Martin's full time job is in Lincoln, Illinois. Both places are approximately 25 miles from the Debtors' home, resulting in round trip combined mileage of about 100 miles per day for the Debtors to get to work. Additional miles are driven each week for Mrs. Martin to get to her part time job and for household errands, doctor visits, and the like. Under §707(b)(1)(A), debtors are allowed standard deduction amounts for vehicle operation. The Debtors have claimed the available deductions for two vehicles, resulting in a

-17-

total deduction of $358. They assert, however, that their transportation expenses exceed the standard deductions by $232 per month and that this expense constitutes a "special circumstance."

One of the challenges of BAPCPA's means test and the calculation to determine the presumption of abuse is the use of standard deductions. For vehicle operation, the amount of the available deductions is based on whether a household has one vehicle or two or more vehicles to operate rather than on the amount of actual miles driven. Thus, debtors who work from home offices and do not travel at all to go to work may take the same deduction for operational costs as debtors who drive 50 miles or more to get back and forth to work as the Debtors in this case do. The Debtors cited no authority for the proposition that they may avoid the limitations of the standard vehicle operating deductions by claiming excess transportation expenses. One court has held, however, that the existence of unusually high transportation costs which exceed the otherwise allowable deductions may constitute "special circumstances." *See* <u>In re Batzkiel</u>, 349 B.R. 581, 586 (Bankr. N.D. Iowa 2006).

Even if the Debtors may claim excess transportation expenses as "special circumstances," the Debtors here have failed to provide sufficient detail for the Court to consider and have failed to provide any evidence of the lack of reasonable alternatives to their high vehicle operating costs. The Debtors have alleged that

their expenses exceed the standard allowance by $232 but provided
no details on the costs to operate their vehicles, the total amount
of miles driven, or any other information to assist the Court in
understanding how the $232 figure was calculated.   Further, the
Debtors have provided no information about any efforts they may
have made to reduce their travel expenses.   Thus, the Court cannot
determine whether the $232 is actually expended each month, nor can
the Court determine whether there are reasonable alternatives to
that expenditure.   For these reasons, the Debtors claim of
"special circumstances" with respect to excess travel costs is
denied.


### E. *Post-Petition 401K Loan*

The Debtors obtained a post-petition loan from Mr. Martin's
401K and claim the payments due on that loan as "special
circumstances."   The Debtors disclosed a $50 per month 401K loan
payment on their original schedules and CMI. With their additional
post-petition borrowing, the amount of their monthly payment has
risen to $220.   The Debtors argue that repayment of 401K loans is
mandatory and, accordingly, there is no reasonable alternative
other than to pay the loans.   The case law on whether 401K loan
repayments may be considered "special circumstances" is evolving
and provides limited support for the Debtors' position. *See*
Lenton, 358 B.R. *at* 662 (401K loan payments may be considered

"special circumstances"); Eisen v. Thompson, ___ B.R. ___, 2007 WL 1880290 (N.D. Ohio 2007) (in the absence of evidence of the reasons for the 401K loan, allowance of 401K loan payments as "special circumstances" by bankruptcy court reversed); McVay v. Otero, ___ B.R. ___, 2007 WL 1957194 (W.D. Tex.) (401K payments may not be deducted as secured debt for means test calculation and case is remanded to bankruptcy court for evidentiary hearing and fact-based analysis to determine if "special circumstances" exist.)

The unique twist in this case is that the bulk of the 401K loans here were obtained post-petition.  The UST urges, and the Court agrees, that close scrutiny should be given to loans of any type which are incurred post-petition and are then put forth as "special circumstances."

In this case, the Court need not decide any of the legal issues raised by the case law involving consideration of whether 401K loans may constitute "special circumstances" because the Debtors failed to provide sufficient detailed information regarding their new 401K loans for this Court to find that they met their factual burden under the statute.  The Debtors assert that they needed funds to assist with expenses incurred as the result of the birth of their new baby in December, 2006.  That may well be true, but the Debtors provided no details of the amounts borrowed or the specific use of the funds.  All the Court really knows is that their monthly 401K loan payment increased from $50 to $220.  That

is not enough information to determine whether there were
reasonable alternatives to the borrowing. Accordingly, the
Debtors' claim of "special circumstances" for their increased 401K
loan payment is denied.

- - -

At the hearing, the side-by-side comparison shows that the UST
believed that the appropriate amount of deductions for the Debtors
was $6,685.03. Giving the Debtors the additional deductions of
$216 for the expenses associated with their new baby and $178 for
the student loan payment raises the total deductions to $7,079.03.
When compared to the Debtors' actual monthly income of $6,951.61,
the result is that the Debtors' monthly disposable income is a
negative $117.32.[3] Because the Debtors have no current monthly
disposable income to pay creditors, they have rebutted the
presumption of abuse. The UST's Motion to Dismiss will be denied.

This Opinion is to serve as Findings of Fact and Conclusions
of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### 

---

[3] The Debtors could also adjust their deduction for vehicle
ownership by $59 which would result in monthly disposable income of
a negative $176.32. This Court has held that debtors are not
required to subtract their highest secured vehicle debt from the
largest standard vehicle deduction in order to minimize the
available deduction as the UST has done here. In re Carlton, 362
B.R. 402, 410 (Bankr. C.D. Ill. 2007). If the Debtors deducted
their lowest secured debt payment of $412 from the largest standard
deduction of $471, a $59 additional expense deduction would result.